## THE CENTRAL RAILROAD vs. WHITEHEAD et al.

HALL, J., dissenting from the views of a majority of the court:

1. Suit was brought against one railroad for an injury occurring on the line of another; service was perfected by serving the agent of the first road, at the station on the line of the second where the accident occurred, and the defendant appeared and pleaded to the merits; afterwards an amendment to the declaration was filed, alleging that the road on which the injury occurred was held and operated under lease by the defendant; no surprise was claimed, no continuance asked, and no plea to the sufficiency of the service of the declaration, as amended, filed, but at the trial objection was made to the amendment and the service:

*Held*, that appearance and pleading to the merits waived service, and estopped the defendant from denying it; and as defendant has received notice and come into court, the object of service has been accomplished.

(a.) Independently of this, the service was sufficient.

2. An amendment alleging that the railroad, on the line of which an injury was received, was held under a lease, and operated by another railroad company, against which suit was brought, was properly allowed.

3. While it might have been sufficient to have alleged that the defendant controlled and operated the road where the injury occur-

red, without specifying the particular character of the agreement under which this was done, yet where the plaintiff alleged with needless particularity or unnecessary circumstances what was material and necessary, and what might have been stated more generally, plaintiff was required to prove the fact as alleged; and therefore, having alleged that one railroad operated another under a lease, it was necessary to prove the same.

(*a.*) If incompetent testimony was admitted over objection, and without it the plaintiff could not recover, a non-suit should be granted on motion, and if improperly refused, and a verdict was rendered for the plaintiff, a new trial should have been granted.

(*b.*) Where it was alleged that one railroad was leased by another, and the evidence showed that the contract between them was in writing, it was not competent to show by parol that it was a lease.

4. It was error to charge that, if one purchased a ticket from one point on the line of a railroad to another, "when the company issued that ticket, it undertook to safely transport the plaintiff to this point of destination, and it was incumbent upon it to exercise ordinary care and diligence, and that duty did not end until the plaintiff was safely landed on the ground at McBean" (the point of destination). Such a charge was calculated to mislead the jury, and to lead them to think that, in addition to having called the station in the usual manner, and having stopped a sufficient length of time to enable the passenger to leave the train with safety, it would also be incumbent on the conductor to assist her in landing.

(*a.*) Ordinary care is not the measure of diligence required of a railroad company towards passengers, but extraordinary care.

5. The court should have charged, as requested, that "if the conductor went through the car and called the name of the station at the usual time and in the usual way, he had the right to expect that the passengers would act with the judgment and intelligence of human beings in moving out and taking care of themselves," and should not have added the qualification, "provided the agents of the company were in full discharge of their duty." The request stated the law correctly, but the qualification greatly impaired, if it did not destroy, its effect.

(*a.*) The newly discovered evidence in this case renders the propriety of a new trial more apparent.

(*b.*) The majority of the court differ from these views.

JACKSON, C. J., concurring, and stating the views of a majority of the court:

1. The fact of the lease could be proved without producing the writing. Nothing in the writing could prevent the liability of the actual carrier, holding itself out to the public as such, if it were negligent, whatever might be its effect as to ultimate liability between the parties thereto.

2. Suit having been brought for an injury which occurred at a railroad station, alleged to have been caused by the sudden jerking of the train while a passenger was in the act of landing, without giving her a reasonable opportunity to do so in safety, there was no error in charging to the effect that the liability of the carrier begins at the starting point, and does not end until the passenger lands in safety.

(a.) The court did not charge or intimate that it was the duty of the conductor to help the woman injured in this case from the car.

3. There was no error in adding the qualification to the effect that the servants or agents of the company must not be at fault, though the conductor was not bound to help women from the cars.

4 The newly discovered evidence in this case being only cumulative and impeaching in its character, and the presiding judge having refused a new trial, this court will not grant a reversal.

5. Conflict of evidence is for the jury, and when they have settled it, and the presiding judge approves the finding, this court will not interfere.

April 2, 1885.

Railroads. Damages. Negligence. Service. Waiver. Amendment. *Allegata* and *Probata*. Non-suit. Leases. Charge of Court. Newly Discovered Evidence. Before Judge RONEY. Richmond Superior Court. April Term, 1884.

This case is sufficiently reported in the opinions of Hall, Justice, and Jackson, Chief Justice.

A. R. LAWTON; J. C. C. BLACK, for plaintiff in error.

TWIGGS & VERDERY, for defendants.

HALL, Justice.

The injury for which this suit was brought against the Central Railroad occurred in Richmond county, at a station on the Augusta and Savannah Railroad, called McBean; the writ in its original form was served on the agent of the Central Railroad at that station. The plaintiff amended her declaration by alleging that the latter road was held and operated under lease by the former. Before this

amendment was made, the defendant pleaded to the merits of the suit. It filed no special plea denying its liability to suit for wrongs occurring by the running of the trains on the other road; neither did it take exception to the service of the writ upon its agent until the case was on trial, without giving the plaintiff any previous notice of either of these defences; at the hearing, it urged them both by objecting to the amendment and excepting to the service; in short, it alleged that it was never served with the writ.

1. That it had notice of the suit is conclusively shown by its appearing and pleading to the merits; it thereby waived the service, and was estopped from insisting that it had not been made. Code, §3335, and citations. No surprise was claimed on account of the amendment, and no continuance was asked because of the same; nor was any offer made to amend the defence and plead to the sufficiency of the service or of the declaration as amended. The fact that the service on the agent was not personal can make no material difference. The defendant had notice and responded to it. The object to be attained by it was to bring the defendant into court, and to afford it an opportunity to be heard, and it availed itself of this opportunity by appearing and pleading. That the service, independent of these considerations, was sufficient, will appear from *Ga. Southern R. R. Co. vs. Bigelow*, 68 *Ga.*, 219 ; and *The Central R. R. vs. Smith*, 69, *Id.*, 268, 272.

2. The amendment was properly allowed. It neither introduced a new party nor a new cause of action; it supplied what the plaintiff deemed defects and omissions in setting out her cause of complaint against the defendant in the declaration, as originally filed. It had this extent, and only this. Besides, under the circumstances, it may be somewhat doubtful if the amendment was necessary; unquestionably it was proper, because the pleadings were thereby made to conform to the facts in the case.

This disposes of the rulings excepted to in the 1st and 2d grounds of the motion for a new trial.

3. As the grounds of the motion following relate to the same subject, they will be considered together.

(3.) Because the court, after said plaintiff had announced that she closed her evidence, and defendant had moved for a non-suit, on the ground that there was no evidence that the defendant was the lessee of the Augusta and Savannah Railroad, allowed said plaintiff to re-open the case and call to the witnesss stand General A. R. Lawton, counsel of defendant, and prove by him that there was a lease of the Augusta and Savannah Railroad by defendant, the witness stating that said lease was in writing, and his testimony being objected to by defendant as inadmissible because the lease was in writing.

(4.) Because the court admitted the evidence of General A. R. Lawton, counsel of defendant, called to the witness stand by plaintiff, that there was a lease between the defendant and the Augusta and Savannah Railroad, it appearing from the testimony of said witness that said lease was in writing, and said evidence having been objected to on that ground.

(5.) Because the court, after the evidence of General A. R. Lawton, as above stated, and plaintiff had again announced that she closed the case, overruled a motion by defendant for non-suit, because the evidence did not authorize a recovery.

(7.) Because the court refused to charge the jury, as requested in writing by defendant's counsel, as follows, viz.: "It is incumbent on the plaintiff to show affirmatively, not only that there was a lease to the Central Railroad Company, technically considered, but also, by the terms of the lease, that company had control of the train on which the accident is alleged to have occurred, and unless there is evidence of this before the jury, plaintiff cannot recover."

The questions made by these grounds are, whether or

not verbal evidence of the fact that the road on which the injury occurred was under lease to the defendant was admissible, when it was shown that the lease was in writing; and whether such evidence of this fact was sufficient to carry the case to the jury, and would authorize them to find a verdict upon that point; and whether the plaintiff was bound to show from the terms and stipulations of the lease its existence, as a condition to her recovery against the defendant, and also that it existed at the time the injury complained of was done, and that defendant then had the road alleged to have been leased under its control and was actually operating it under the lease. These several positions are only different modes of stating the same objection, and that is that it was incompetent to prove by parol the fact that the lease existed; for if this point is well taken, and it is true that without this proof the plaintiff could not recover, then the non-suit moved for, I think, should have been awarded, or if improperly overruled, a verdict was rendered in favor of the plaintiff, then the new trial asked for by the defendant should have been granted. 42 *Ga.*, 265. The averment in the plaintiff's declaration, that the defendant was the lessee of the road in question, may have been, and I am inclined to think was, unnecessary and immaterial, yet it was not impertinent. It would have been sufficient to allege that the defendant controlled and operated the road, without specifying the particular character of the agreement under which it was so held and operated. But when the plaintiff goes further and alleges with needless particularity or unnecessary circumstances what is material and necessary, and which might have been properly stated more generally without such circum stances or particulars, then she is required to prove them precisely as laid; and this requirement is especially applicable in cases where a failure to comply with it would re sult in a variance, as in the instance of records, written instruments and perhaps special contracts. Gould's Plead., ch. 3, §§185, 183, 186, 189; 50 *Ga.*, 591, 593, 594.

And the lease being in writing, it is now insisted that the fact of its existence can be proved in no other way than by the production of the writing itself. It is said that this results from the familiar rule that the best evidence the nature of the case admits of must be produced. Professor Greenleaf, in his work on Evidence, §82, treating of this rule, says: "It is adopted for the prevention of fraud; for when it is apparent that better evidence is withheld, it is fair to presume that the party had some sinister motive for not producing it, and that if offered his design would be frustrated. The rule thus becomes essential to the pure administration of justice.. In requiring the production of the best evidence applicable to *each particular fact*, it is meant that no evidence shall be received which is merely *substitutionary* in its nature, so long as the original evidence can be had." (The italics are mine.) "The rule excludes only that evidence which itself indicates the existence of more original sources of information." . . . . "Thus a title by deed must be proved by the production of the deed itself, if it is within the power of the party; for this is the best evidence of which the case is susceptible, and the non-production would raise a presumption that it contained matter of apparent defeasance." Our Code, §3760, in no less imperative language, declares, "The best evidence which exists of the *fact* sought to be proved must be produced, unless its absence is satisfactorily accounted for." And several of the cases from which its terms are taken, and others decided since its adoption, have applied it to instances analogous to, if not directly in point with, the present case. See citations thereunder, especially 48 *Ga.*, 116, where it was held that a witness could not be made to impeach himself by showing that he had pleaded guilty during the term of court then in session to a criminal offense. The record of the plea was the highest and best evidence. So also, in 64 *Ga.*, 567, it was held that the production of the award itself was the highest and best evidence of an arbitration. *Gilmore vs. Bangs*, 55

*Ga.*, 403, cited by counsel for plaintiff in error, is in point and applies the rule to the written assignment of an account.

The rule is of ancient date and is applied with much strictness both in England and the various states of the Union; the exceptions to it are few. 1 Greenleaf Evidence, §83, and this case does not fall within them. Starkie Evidence, p. 641 *et seq.* and notes, English and American, will afford illustrations and instances precisely similar, if not identical with this. In 27 Md., 91, the Supreme Court of that state held that a seizure and sale under a distress warrant could only be shown by the production of the warrant itself and the entries thereon, unless its absence was satisfactorily accounted for. It is difficult to conceive how parol testimony, to the effect that a certain property is held by one party under a lease from another, which is in writing, can be given, without necessarily, to some extent, going into the contents of the writing. The paper must on its face show these with other facts. Without them, there would be no parties to the contract and no subject about which they were contracting. Testimony relating to a part of the contents of the agreement would violate the rule as effectually, though not to so great an extent, as if it professed to give its entire contents. If the rule applies to a portion of the writing, why does it not extend to the whole? There is no discrimination, that I am aware of, in this respect as to its different parts,—no specification as to what parts of it are without and what within the operation of the rule. It must be remembered, too, that it is the province of the court, and not of the witness, to determine whether the writing stipulates for the particular contract which the pleadings set forth, and to enable the court to do this, the writing itself must be produced for inspection. While I think that these rules of evidence should have been complied with on the trial, and that for a failure to do so, the judgment should be reversed, my

brethren are of a different opinion, and it follows that the plaintiff in error takes nothing by this exception.

4. The next assignment of error is that complained of in the first ground of the amendment of the motion for a new trial, and which is, "that the court erred in charging the jury, if they believed the plaintiff bought a ticket in Augusta over the line of road to McBean, when the company issued that ticket, it undertook to safely transport the plaintiff to this point of distination, and it was incumbent upon it to exercise ordinary care and diligence, and *that duty did not end until the plaintiff was safely landed on the ground at McBean,"*—the special exception to this charge being to the underscored words in the concluding paragraph.

It may not be amiss to remark, before proceeding to examine the exception here made, that the rule of diligence to be observed by common carriers of passengers is not ordinary, but extraordinary care. Code, §2067. This remark is made to correct what we deem was an inadvertent error upon the part of our learned brother who tried the case, and to avoid the possibility of having it inferred that we sanctioned by our silence the rule laid down. I think the latter part of this charge is expressed in such inexact language, and is so incautiously and loosely worded, that it may, in a closely balanced case, such as this was, have misled the jury, and impressed them with the idea that the duty of the company was not fully discharged, when the station for which the plaintiff was destined had been reached and called, and the train stopped at it a sufficient length of time to enable her to leave it with safety, but that it was also incumbent upon the conductor to assist her in landing. We held, in *Nunn vs. The Georgia Railroad,* 71 *Ga.,* 710, that when the station was called and the train had been stopped a sufficient time to allow the passengers to leave it with safety to life and person, the company had discharged its duty; but that it was not essential to the performance of the ordinary duties of con-

v 74-29

ductors in putting passengers off the train that they should go further; and that any other assistance than this which they might render should be deemed mere acts of courtesy on their part, for a failure to perform which the company would not be liable, unless, as was suggested rather than decided, a custom of assisting unattended females, children, etc., known, or presumed to be known, to the company would, to that extent, modify the rule and impose an additional duty upon conductors, for the neglect of which in case of injury they would be liable.    There is, however, it seems, nothing in this record that would justify the inference that it was the custom of the conductor to assist colored females, to which class the plaintiff belonged, to alight from the train.    White and colored passengers were transported in separate coaches, and on the night in question, after the station was called and the train stopped, the conductor appears to have given his attention to the white passengers and assisted them to land.    Whether the plaintiff left the train before it was stopped, and whether she was injured by her own haste and carelessness, if injured at all, by her exit from it, were the points in controversy, and upon which the evidence was very conflicting, and I am of opinion that a charge so peremptory and unguarded in its terms as that under consideration was, to say the least, if not inapposite and well calculated to mislead the jury, at least unnecessary.    Here again I am unfortunate in having to differ from my brethren. Although the charge is not as carefully guarded and as aptly expressed as it might have been, yet they are not so well satisfied of its tendency to mislead as warrants them in concluding that it did so far mislead the jury as would justify them in setting aside the verdict; nor am I more fortunate in securing their concurrence in the views that follow.

5. The court was requested by the defendant in writing to charge the jury, "If the conductor went through the car and called the name of the station, at the usual time and in the usual way, he had the right to expect that the

passengers would act with the judgment and intelligence of human beings in moving out and taking care of themselves," which was given with the addition, " provided the agents of the company were in full discharge of their duty."

The principle asserted by this request, I am satisfied, was correct and directly applicable to the case, and it should have been charged without addition or modification. I am equally clear that its effect was greatly impaired, if not destroyed, by the qualification annexed by the court. "When the station had been reached, and the train had been stopped for the requisite time, it was the duty of passengers about to leave it to avail themselves of the opportunity thus afforded and the provision made for that purpose, in a careful and prudent manner, and when they failed to do this, as by attempting to get off before the train was stopped, in violation of the known and obvious rules and requirements of the company, they would not, in case of damage done solely in consequence of their own negligent conduct, be entitled to recover against the company. It is no part of the duty of the company's agent to superintend their departure from the cars and to see that they do not act in a negligent and imprudent manner; he has a right to presume that they will act with the ordinary care and intelligence of rational beings in moving out and taking care of themselves." Pennsylvania Rwy. *vs.* Zebe and wife, 2 Redfield Am. Rwy. Cases, 536. The qualification to this request is too general and vague, it is indeterminate, and points to and specifies none of the duties which it is incumbent on the company's agents to discharge either partially or fully; it asserts simply that it must be shown they were in the full discharge of all their duties, whatever the jury might conjecture or suppose they were; they were certainly not instructed as to any which the law required at the hands of such agents.

While, in a clear and unquestioned case, where the uncontroverted facts were such as to require the verdict, I

would not consent to send it back for another hearing, yet in one where the evidence is so conflicting and contradictory upon the main points as it is in this, and where the damages are so large as here, I think, with the utmost deference to the opinions of my colleagues, that another opportunity should be afforded to this company to have, under the law, the full measure of its rights in the charges of the court to the jury, and in its rulings upon questions of evidence; and I am the more satisfied of the propriety of this course by what was revealed in the newly discovered evidence accompanying the motion for a new trial. This renders it quite probable, in my judgment, that the injury for which the railroad company was compelled to pay, if not solely caused, was greatly enhanced, by a casualty that befell the plaintiff on her way home from the depot on the night of the occurrence. The direct charges made by the evidence are met in an elusive and uncandid manner; there is no direct denial of them, and the witness best qualified to speak in relation to the fact revealed, and to contradict it if it did not exist, is not even brought forward, although he was the kinsman of the plaintiff; nor is he otherwise accounted for.

With my dissent, the judgment of the court below is affirmed by the majority of this court.

Judgment affirmed.

JACKSON, Chief Justice, concurring.

The majority of the court hold in this case as follows, on the several assignments of error:

1. That the fact of the lease may be proved without producing the writing. Nothing in the writing can possibly prevent the liability of the actual carrier holding itself out to the public as such, if it be negligent. As between itself and the lessor, it might regulate the payment of damages. As respects the public, it cannot. So if the lease showed that the lessor had to pay all the damages, it could

not alter the responsibilty of the actual carrier. Moreover, the pleading of the plaintiff in error admits the lease, as I remember the record, not before me now.

2. The court committed no error in this charge, that the responsibility of the carrier extended until the passenger was at the end of the journey her ticket called for, landed safely on the ground. The court did not charge or intimate that the conductor's duty was to help the colored woman off the cars; but as the contention of the defendant in error was that she was hurt by a sudden jerk of the train while she was getting off herself, the charge was exactly right. It would be strange law indeed if the carrier should be bound until the train reach the depot, and then, when the passengers were getting off, the engineer should be at liberty to make sudden jerks and kill or hurt the passengers *ad libitum*. Practically it would do the passenger little good to carry him safely to Augusta, but the moment he got there, to jerk the cars about so that he could not land in safety. The liability of the carrier begins when the train starts and ends only when the passenger lands safely. If the train stops long enough for him to get off, and keep still, then the company's servants have done all they could, and the fault is the passenger's; but if jerks, sudden jerks, while he is getting off, injure him, he having not time to get off safely—reasonable time, then the servants of the company have not exercised all reasonable and ordinary care due to everybody, and certainly not that extraordinary care and diligence due to a passenger.

3. There was no error, we think, in qualifying the request as the judge did, to the effect that the servants or agents of the company must not be at fault, though the conductor be not bound to help women off the cars; the court obviously having reference to the jerks of the engineer.

4. Nor was there error in not granting the new trial on the newly discovered evidence. This ground is not a

favorite with the courts. It is cumulative or impeaching or both here; and the counter-affidavits were all before the court below for the exercise of his discretion. The majority of the court think that this ground does not authorize a new trial, over the head of the presiding judge.

5. This court has ruled too often that conflict of evidence is for the jury, and that when that tribunal settles it and the presiding judge approves the finding, this court does not interfere, to repeat that stereotyped adjudication again.

It is for these reasons that the majority of the court decline in the case of this woman, though a colored woman, to interfere with the verdict of the jury and the judgment of the court below.

BLANDFORD, Justice, concurred with JACKSON, Chief Justice, but furnished no written opinion.